IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
3:10-CV-655-GCM

| | |
|---|---|
| JOHNNY LEE BELL, ) | |
| ) | |
| Petitioner, ) | |
| ) | |
| v. ) | **ORDER** |
| ) | |
| ALVIN W. KELLER, JR., ) | |
| ) | |
| Respondent. ) | |

**THIS MATTER** is before the Court on consideration of Respondent's motion for summary judgment. For the reasons discussed herein, Respondent's motion will be granted and Petitioner's habeas petition, filed pursuant to 28 U.S.C. § 2254, will be denied and dismissed.

## I. BACKGROUND

On January 9, 2008, Petitioner was convicted of attempted robbery with a firearm, possession of a firearm by a felon, first-degree murder in perpetration of a felony, and felony conspiracy to commit robbery with a firearm. Petitioner was sentenced to a term of life imprisonment in the North Carolina Department of Corrections.[1] Petitioner filed an appeal from his convictions and sentence to the North Carolina Court of Appeals who summarized the facts of Petitioner's case as follows:

> Walter Gordon (the victim) died as a result of two gunshot wounds that he suffered on 14 November 2005. On 14 November 2005 Jermaine Gamble (Gamble) was at a gas station with Defendant and Darrin Sanders (Sanders). While Gamble was pumping gas, he overheard Sanders and Defendant talking about a possible robbery. Afterwards, all three men drove to Bessemer City. Defendant and Gamble went to Defendant's

---

[1] Following his sentencing, the North Carolina Department of Corrections was re-organized as the Division of Adult Corrections which is contained within the North Carolina Department of Public Safety. See N.C. Gen. Stat. § 143B-259 (2011).

1

grandmother's house and Sanders went elsewhere. Later that evening, Gamble and Defendant picked up Sanders in Gamble's car. Sanders gave Gamble directions to the location of the proposed robbery. Once they arrived in the victim's neighborhood, Sanders and Defendant got out of the car to talk with two men, Tony Davis (Davis) and Ricky Sadler (Sadler). Next, Defendant, Sanders, and Gamble drove around the neighborhood. After a while, Sanders and Defendant left the car and Gamble drove away. Gamble planned to return for Sanders and Defendant, but was stopped by police and arrested before picking them up.

Sadler testified that he had known the victim for many years, even buying marijuana and visiting with him in the past. On 14 November 2004, Davis asked Sadler to buy some marijuana for him from the victim. Davis talked to Sanders and Defendant offered Sadler a beer. Davis gave Sadler money for the marijuana and Sadler left for the victim's house. Sadler testified that he was in the victim's house for about five minutes and as he was walking out, Defendant and Sanders rushed in. Sadler saw that Defendant was armed and knocked his hand away. After Sadler hit Defendant's arm, he saw Defendant fire two shots. Sanders held a gun to Sadler's head while Defendant patted down the victim asking, "where is it at[?]" After a few minutes, Defendant and Sanders left. Sadler checked on the victim, who was laying on the ground, and called police.

David Brogdon, a detective from the Criminal Investigator Division of Gastonia City Police Department, interviewed Defendant. He spoke with Defendant on 15 November 2005 at Defendant's house. Upon Brogdon's request and assurance that Defendant was not under arrest, Defendant went to the police department. Brogdon asked Defendant if he knew about a shooting and robbery in Gastonia. Defendant initially denied knowledge of the incident, but after more questioning, admitted that he was in Gastonia on 14 November 2005. Defendant recalled that he had gone with Gamble to meet Sanders and Sanders' girlfriend, and that he and Gamble had gone to eat and had driven to Defendant's grandmother's home where Defendant and his girlfriend remained the entire night. After offering the statement, Defendant told Detective Brogdon that he wished to leave and left the police station.

A warrant for Defendant's arrest was issued on 6 December 2005 for robbery with a dangerous weapon and possession of a firearm by a felon. On the morning of 7 December 2005, Brogdon and Detective Putnam spoke with Defendant at Defendant's girlfriend's house. Defendant was placed into custody and taken to the police station. After signing a written waiver of his *Miranda* rights, Defendant denied knowledge of the incident. Defendant stated, "I can't believe this, I'm going to go back to jail, I could get the chair for this." Brogdon testified to the following:

[Defendant] grew more aggravated and said I'm done, take me to jail, I'm done

with this. I said, okay and that he could decide his fate. [Defendant] said it didn't matter to him because he was going to jail anyway. I told him if he wanted to get his story out, that he would have to call us for now. [Defendant] said that he would talk to his attorney and decide if he wanted to talk. The conversation ended.

Before taking Defendant to the Gaston County Jail, Putnam and Brogdon stopped by the magistrate's office. Defendant initiated a conversation with Detective Brogdon while the magistrate completed the paperwork. Defendant said, "I can't believe that I'm going to be going back to prison, I didn't even set this up. [Sanders] is the one that knew the guy that set this up." Brogdon informed Defendant that he could not talk with him unless Defendant initiated the conversation. After the paperwork was completed, Defendant turned to Brogdon and said, "if you know I didn't set this up, that I don't know the old man, you need to do your job and help me out."

Later that day, Brogdon learned that the victim had died. Another warrant was issued on 7 December 2005 for first-degree murder of the victim. Brogdon and Putnam went to the Gaston County Jail to serve Defendant with the new warrant. Deputies brought Defendant to an interview room for Brogdon and Putnam to serve Defendant with the new warrant. While reading the warrant aloud, Defendant again made comments to Brogdon. Brogdon reminded Defendant that he could not talk to him unless Defendant initiated the dialogue. Defendant said, "I told you I want to talk to you, do what you got to do." Defendant waived his *Miranda* rights by signing a statement that read, I want to talk to Detective Brogdon and Detective Putnam about this charge." During this conversation Defendant admitted that he shot the victim, but "only after [Sanders] did."

State v. Bell, 196 N.C. App. 790, 675 S.E.2d 719, 2009 WL 1195095, at *1-3 (N.C. Ct. App. 2009) (unpublished table opinion).

Further facts will be discussed as needed herein.

## II.  STANDARD OF REVIEW

A.  Summary Judgment Standard

Summary judgment is appropriate in those cases where there is no genuine dispute as to any material fact, and it appears that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c)(2); United States v. Lee, 943 F.2d 366, 368 (4th Cir. 1991). Any permissible inferences to be drawn from the underlying facts must be viewed in the light most

3

favorable to the party opposing the motion. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587–88 (1986). Where, however, the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, disposition by summary judgment is appropriate. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248–49 (1986).

      B.      Section 2254 Standard

In addition to the motion for summary judgment standard set forth above, this Court must also consider the Petition for Writ of Habeas Corpus under the requirements set forth in 28 U.S.C. § 2254. Section 2254(d) provides that:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim:
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); see also Tice v. Johnson, 647 F.3d 87, 103 (4th Cir. 2011).

A claim is considered "adjudicated on the merits" when it is "substantively reviewed and finally determined as evidenced by the state court's issuance of a formal judgment or decree." Young v. Catoe, 205 F.3d 750, 755 (4th Cir. 2000) (quoting Thomas v. Davis, 192 F.3d 445, 455 (4th Cir. 1999)). A state court adjudication is "contrary to" clearly established federal law only if "the state court arrives at a conclusion opposite to that reached by [the United States Supreme] Court on a question of law or if the state court decides a case differently than [the United States Supreme] Court has on a set of materially indistinguishable facts." Williams v. Taylor, 529 U.S. 362, 412-13 (2000). "It is not enough for us to say that, confronted with the same facts, we would have applied the law differently; we can accord [the petitioner] a remedy only by

concluding that the state court's application of the law in his case was objectively unreasonable." See Tice, 647 F.3d at 103 (citing Williams v. Ozmint, 494 F .3d 478, 483-84 (4th Cir. 2007)). "[W]e will not discern an unreasonable application of federal law unless 'the state court's decision lies well outside the boundaries of permissible differences of opinion.'" Id. at 108 (quoting Goodman v. Bertrand, 467 F.3d 1022, 1028 (7th Cir. 2006)).

When examining whether a state court's judgment "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," 28 U.S.C. § 2254(d)(2), a reviewing court must be mindful that a "determination of a factual issue made by a State court shall be presumed to be correct" unless a petitioner rebuts this presumption "by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

### III. DISCUSSION

Petitioner contends that the Gaston County detectives obtained his confession in violation of his 5th and 6th Amendment rights by questioning him after he had invoked his right to counsel. Petitioner maintains that he informed the detectives that he would only have further communication with them after he spoke with an attorney. Notwithstanding this pronouncement, as Petitioner contends, the detectives returned to his cell a mere ten hours later and began to question him again. (Doc. No. 1 at 5). Petitioner continues by noting that he confessed to his involvement in the crimes only after the detectives questioned him ten hours later and this questioning "rendered involuntary his alleged waiver of rights, and therefore his subsequent statements should not have been admitted into evidence, pursuant to [Edwards v. Arizona, 451 U.S. 477 (1981)]. The State Court ruling that allowed the admission of [Petitioner's] statement was contrary to and an unreasonable application of clearly established Federal law, as determined by [Edwards]. The State Court ruling was further based on an unreasonable

5

determination of the facts in light of the evidence presented in the State Court proceeding." (Doc. No. 1-1 at 1).

Prior to Petitioner's trial, his counsel filed a motion to suppress his statements that were made after this ten-hour window and the motion was accompanied by an affidavit from Petitioner. In the motion to suppress, as he does here, Petitioner contends that any statements he made after he invoked his right to counsel should be excluded, and that Petitioner never knowingly and voluntarily waived his right to remain silent and his right against self-incrimination. (Doc. No. 1-2 at 4). In his affidavit, Petitioner avers that he did poorly in school and was in special education classes; that he used drugs and alcohol on a frequent basis; that after spending ten years in jail and being released on or about August 18, 2005, he resumed his frequent use of drugs and alcohol until the day the present state charges crimes occurred on November 14, 2005; that he was still using drugs and alcohol on November 15, 2005, the date he was first interviewed by law enforcement; and on December 7, 2005, the date he was arrested and "allegedly gave voluntary written and oral statements. At none of the above times was I able to give a knowing, willing and voluntary waiver of my right to be silent and against self-incrimination or my right to have a lawyer present." (Id. at 6 ¶ 4). Petitioner goes on to aver that he had no present recollection of providing statements to the officers on the day of his arrest, nor does he recall his rights being read to him.

A hearing on the Petitioner's suppression motion came was heard before the Honorable Jesse B. Caldwell, II, prior to trial. At the hearing, one of the arresting officers who allegedly questioned Petitioner ten hours after Petitioner claims to have unequivocally invoked his right to counsel, testified regarding his recollection of events. The North Carolina Court of Appeals

examined the trial court's findings of fact and conclusions of law which were challenged on appeal:

## MOTION TO SUPPRESS

On 28 December 2007, prior to trial, Defendant filed a Motion to Suppress any statements made by Defendant to law enforcement officers. In an affidavit, Defendant asserted that he was not able to give a knowing, willing and voluntary waiver of his right to be silent or to have a lawyer present. In denying Defendant's motion to suppress, the trial court made findings of fact and conclusions of law. The trial court concluded, in relevant part, the following:

The defendant understood the meaning and effect of his statements to law enforcement. 4. That the defendant did understand his Miranda rights and warnings and that he was not substantially impaired....
....

8. That there was no request by the defendant that he receive counsel or have counsel present during any of the statements he made to the law-enforcement representatives. 9. That the defendant was in full understanding of his constitutional right to remain silent and right to counsel and all other rights, and that he freely, knowingly, intelligently, and voluntarily waived each of these rights, thereupon made the respective statements to the law-enforcement officers as found in the foregoing findings of fact. 10. That the defendant's written statement to the Gastonia city detectives ... and the oral statements which gave rise to the same were the voluntary result of the defendant requesting to speak with the aforesaid law enforcement representatives, and that the aforesaid conversations were initiated by the defendant and not by law-enforcement representatives.

The trial court concluded that none of Defendant's constitutional rights were violated by his arrest, detention, interrogation, or statement, and denied his motion to suppress.

Defendant argues that the trial court committed plain error in denying Defendant's motion to suppress statements made to police because the statements were the result of police interrogation after he had invoked his right to counsel. As a result, Defendant asserts that a new trial is required. We disagree.

It is undisputed that Defendant's motion to suppress was made prior to trial and that Defendant did not object to the evidence at the time it was presented at trial in the presence of the jury. North Carolina Rules of Appellate Procedure state that, "[i]n order to preserve a question for appellate review, a party must have presented to the trial court a timely request, objection or motion, stating the specific grounds for the ruling the party desired the court to make if the specific grounds were not apparent from the context." N.C. R. App. P. 10(b)(1).

Bell, 2009 WL 1195095, at *2-3.

As noted by the facts stated in the court of appeals' opinion, Petitioner voluntarily spoke with officers on November 15, 2005, at the police station one day after the crimes occurred. Petitioner denied any involvement and claimed that he had been with his girlfriend all night. On December 6, 2005, a warrant for Petitioner's arrest was issued and he was taken into custody by Detectives Brogan and Putnam the next day. After arriving at the station, Petitioner signed a written waiver of his Miranda rights, and again denied any involvement and said that he may talk further after speaking with his attorney. After arriving at the magistrate's office to complete some paperwork, Det. Brogdon testified that Petitioner initiated a conversation, stating "I can't believe that I'm going back to prison, I didn't even set this up. [Sanders] is the one that knew the guy that set this up." Having invoked his right to counsel at the station, Brogdon informed Petitioner that he could not have a conversation with him unless Petitioner initiated it. The paperwork was completed and Petitioner turned to Brogdon and, according to the testimony, said "if you know I didn't set this up, that I don't know the old man, you need to do your job and help me out." Id., at *2.

The same day Petitioner was arrested and taken into custody, the victim died from the gunshot wounds and a warrant for first-degree murder was issued naming Petitioner as the defendant. Detectives Putnam and Brogdan traveled to the Gaston County Jail to serve the warrant on Petitioner. Deputies delivered Petitioner to an interview room and as the charges were read aloud, the evidence shows that Petitioner again made comments to Brogdon who once again explained that he could not talk with Petitioner unless Petitioner initiated the conversation. Petitioner responded by stating that "I want to talk to you, do

what you got to do." Defendant then signed a written waiver which read, "I want to talk to Detective Brogdon and Detective Putnam about this charge." In the ensuing conversation, Petitioner admitted to shooting the victim, "but only after [Sanders] did." Id.

First, the Court finds that the question of whether Petitioner knowingly waived his right to remain silent and his right to counsel after earlier invoking those rights was adjudicated by the State Court on the merits. That is, the court of appeals provided reasoned analysis of the facts as presented through the evidence given during Petitioner's suppression hearing. Second, it is not difficult to find that this evidence and the State Courts' findings thereon do not run afoul of the provisions of Section 2254. The State Court's finding regarding the knowing and voluntary nature of the waiver is not contrary to or involving an unreasonable application of law as determined by the Supreme Court of the United States. See § 2254(d)(1). There was no ambiguity in Petitioner's first written waiver of counsel prior to his disavowing involvement in the crimes of November 14, 2005. And there was no ambiguity when Petitioner invoked his right to counsel at the police station and refused to talk further. Most importantly, however, is that the court of appeals found no ambiguity in Petitioner's knowing and voluntary waiver of his right to counsel following the presentation of murder warrant.

As found already, the evidence shows that Petitioner did invoke his right to counsel, and from the moment he invoked his right to counsel he was "not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." Edwards v. Arizona, 451 U.S. 477, 484-85 (1981). As the Supreme

Court has explained, the bright line requirement that the *suspect* must initiate further conversation was designed to protect the right to counsel as set forth in Miranda v. Arizona, 384 U.S. 436 (1966). However, to invoke the right to counsel and prevent further questioning, a suspect "must take an action that 'can reasonably be construed to be an expression of a desire for the assistance of an attorney.'" United States v. Johnson, 400 F.3d 187, 194 (4th Cir. 2005) (quoting McNeill v. Wisconsin, 501 U.S. 171, 176 (1991)). The evidence present here shows that Petitioner's initiation of a conversation with Det. Brogdon after having invoked his right to counsel is not reasonably construed as an express desire to only communicate through counsel.

"[I]f the accused invoked his right to counsel, courts may admit his responses to further questioning only on finding that he (a) initiated further discussions with police, and (b) knowingly and intelligently waived the right he had invoked." Smith v. Illinois, 469 U.S. 91, 95 (1984) (citing Edwards, 451 U.S. at 486 n.9).

In sum, the evidence before the State Court shows that Petitioner initiated the dialogue following invoking his right to counsel; that he was warned; and that he acknowledged that he wanted to talk about the charge. Next, Petitioner signed another waiver of his Miranda rights, expressly stating in writing that he wanted to talk with the detectives about the charge, and then he admitted his involvement in the shooting. The State Court had no trouble concluding that he had knowingly and voluntarily waived his right to counsel, even though he had clearly invoked it hours earlier. The Court finds that the State Court's conclusion is neither contrary to Supreme Court precedent nor is it an unreasonable interpretation of the facts as those were presented in the State proceedings. § 2254(d)(1) & (d)(2). Consequently, Petitioner is not entitled to habeas relief.

Id. § 2254(d) (an application shall not be granted if Petitioner cannot meet the requirements under § 2254(d)(1) or (d)(2)).

For the foregoing reasons, Petitioner's request for habeas relief and a new trial must be denied.

## IV. CONCLUSION

**IT IS, THEREFORE, ORDERED** that:

1. Respondent's Motion for Summary Judgment is **GRANTED**. (Doc. No. 9).

2. Petitioner's petition for habeas relief pursuant to 28 U.S.C. § 2254 is **DENIED** and **DISMISSED**. (Doc. No. 1).

**IT IS FURTHER ORDERED** that pursuant to Rule 11(a) of the Rules Governing Section 2254 and Section 2255 Cases, this Court declines to issue a certificate of appealability as Petitioner has failed to make the required showing. See 28 U.S.C. § 2253(c)(2); Miller–El v. Cockrell, 537 U.S. 322, 338 (2003) (in order to satisfy § 2253(c), a petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong); Slack v. McDaniel, 529 U.S. 473, 484 (2000) (when relief is denied on procedural grounds, a petitioner must establish both that the dispositive procedural ruling is debatable and that the petition states a debatable claim of the denial of a constitutional right).

Signed: February 28, 2013

Graham C. Mullen
United States District Judge